# EXHIBIT 1

Morelli - direct

1  Q.    And then you left Summit North Marina?
2  A.    Saturday.
3  Q.    But you never paid Summit North Marina for the taking
4  the boat in and out and putting it back in the water or any
5  of the wharfage or dock rental while your vessel had been
6  there; is that correct?
7  A.    Did I pay them?  No, that's correct, I did not.
8  Q.    So that bill is still outstanding; is that correct?
9  A.    Well, the problem was Summit never issued a bill.
10 Q.    When you left the marina, you certainly knew you owed
11 them some money, didn't you?
12 A.    Absolutely, sir.  And I went to the office and asked
13 them to give me a bill.  And Janet, who was the manager at
14 the time, said it wasn't ready.
15 Q.    You subsequently did receive a copy of the bill?
16 A.    No, sir.
17 Q.    Didn't you receive -- wasn't there a bill that was
18 made an exhibit in this litigation?
19 A.    Well, yes, sir, but -- I'm sorry, Your Honor.
20           THE COURT:  See if you can answer his question.
21           THE WITNESS:  He is asking me yes and no, and
22 it's a little difficult.  Yes, he handed me a bill but the
23 bill he handed me, my boat wasn't there at the time.
24           THE COURT:  Go ahead and finish your question.
25 A.    That was the first bill I saw from Summit Marina.

Morelli - direct

1       MR. HESS: Thank you, Your Honor.
2  BY MR. HESS:
3  Q.    You made some allegations in your brief concerning
4  the damage to the vessel during the arrest and state in the
5  brief, quote-unquote, witnesses to the arrest noted that
6  one or more of the boat's outriggers were bent during the
7  arrest. First of all, tell the Court what an outrigger is.
8  A.    An outrigger comes off the side of the boat almost
9  like an antenna. If you were sitting on the side, it would
10 be like an antenna that goes right up. When you go fishing,
11 it goes off to the side of the boat so you can put more lines
12 out.
13 Q.    Who were the witnesses?
14 A.    But, Mr. Hess, I didn't say that the outriggers were
15 bent. Somebody told me and that is just hearsay. But the
16 pictures we have of the damage to the hull is basically what
17 I'm really concerned about because that is fiberglass repair.
18 Q.    But in your brief, you said witnesses noted that
19 one or more of the boat's outriggers were bent during the
20 arrest. Who were the witnesses?
21 A.    Friends of mine down in Delaware.
22 Q.    Do they have names?
23 A.    Yes, they do.
24 Q.    And what are their names?
25           THE WITNESS: Do I have to give their names, Your

Morelli - direct

1  Honor?
2        THE COURT: You sure do, unless your lawyer wants
3  to claim that is privileged in some fashion.
4        THE WITNESS: I would want it claimed as
5  privileged because the guy is a friend of mine.
6        THE COURT: Well, you know, the short of it is
7  you don't have to give the answer unless Mr. Hess thinks it's
8  crucial to have that name. I'll tell you this, though: If
9  you are not willing to give the name, it doesn't assist with
10 the credibility of the assertion you are making. Do you see
11 what I mean?
12       THE WITNESS: I understand that, Your Honor.
13       THE COURT: I leave that to you to decide what
14 you want to do, give the name or not.
15       THE WITNESS: And --
16       THE COURT: Do you want an opportunity to confer
17 with Mr. Seitz?
18       MR. SEITZ: Your Honor, perhaps this would be a
19 good opportunity for Mr. Morelli to talk with me about the
20 privileges that are available with him.
21       THE COURT: Hold on just a minute. It's a little
22 unusual to break in the middle of what is in effect a cross
23 examination. But I'm not aware of any privilege that might
24 apply here. If you really think there might be one, I might
25 make an exception to the usual rule if Mr. Hess is going to

1  press for that answer.  So the ball is sort of in your court,
2  Mr. Hess.
3          MR. HESS:  Your Honor, I understand that and I
4  appreciate your indulgence in that regard.
5          I with withdraw and rephrase question in a manner
6  that I think will preclude us from running into this problem.
7  BY MR. HESS:
8  Q.    You identified in a pretrial document three witnesses,
9  a Dan Healy, Albert Cocozzi (phonetic) and Jerry Mastrioni
10 (phonetic).  You know all three of those gentlemen; is that
11 correct?
12 A.    Yes, sir.
13 Q.    None of them were present when Long Island Lady was
14 placed under admiralty arrest, were they?
15 A.    No, sir.
16 Q.    So no one is going to be able to come into court and
17 testify that the outriggers were bent during the arrest; is
18 that correct?
19 A.    No, sir.
20 Q.    Okay.  Thank you.
21         THE COURT:  Wait just a second.  I want to make
22 sure I understand.  When you say "no, sir," what you are
23 saying is Mr. Hess is correct that no one is going to come in
24 and do that; am I right?
25         THE WITNESS:  Yes, Your Honor.

```
 1              THE COURT:  Okay.
 2              THE WITNESS:  I'm hoping the outriggers will
 3    stand on its own merit.
 4              THE COURT:  Okay.  Go ahead, Mr. Hess.
 5              MR. HESS:  Your Honor, I have no further
 6    questions of Mr. Morelli at this time, reserving the right
 7    to recross, should he be called in his case-in-chief or on
 8    recross immediately after direct examination.
 9              THE COURT:  I understand the second part,
10    which is you have the right to cross him, when called by
11    Mr. Seitz.  I'm not sure I understood when you said
12    case-in-chief.  You mean the other side's case-in-chief?
13              MR. HESS:  Yes.  Conceivably, Mr. Morelli could
14    be called immediately be called to give direct testimony at
15    the close of the plaintiffs' case, so at either juncture I
16    reserve my right to recross.
17              THE COURT:  I only think there is one chance for
18    him to get called again, and that is if Mr. Seitz called
19    him.  You are not calling him again; right?
20              MR. HESS:  I won't call him again, Your Honor.
21              THE COURT:  All right.  Fine.
22              Mr. Morelli, you may step down.  Thank you, sir.
23              THE WITNESS:  Thank you, your Honor.  Thank you
24    for your patience.
25              THE COURT:  Yes, that's okay.
```

```
 1  is there any other matter that we ought to talk about while
 2  we're all in the courtroom together?  Mr. Hess, from your
 3  side?
 4              MR. HESS:  Not that I'm aware, your Honor.  I
 5  have 45 minutes and I will speak quickly.
 6              THE COURT:  Okay.  Mr. Seitz, from your
 7  direction?
 8              MR. SEITZ:  Your Honor, we still have the issue
 9  of the outriggers being inside the shrink-wrapped boat.  We
10  don't know whether they're damaged or not.  We haven't had
11  access to determine whether they are.  If they aren't, that's
12  fine, then there is not going to be a claim.  But that issue
13  remains open.
14              THE COURT:  Well, I think there may be a fairly
15  straightforward way to do that.  If your client wants to go
16  and break the shrink wrap and look, and then the onus is on
17  your client to rewinterize it.
18              MR. MORELLI:  They could have put a zipper on it
19  so I can get in the boat.
20              THE COURT:  Well, water is under the bridge at
21  this point on that score.  I mean I have to deal with what
22  is.  And what is, is we got a shrink-wrapped boat.  If you
23  want to go take a look at the evidence, I guess what I'm
24  saying is I don't see a problem with your doing that.  What
25  the cost fallout of that would be, I'm not prepared to say
```

1  sitting here.  It could be that the fair application of costs
2  for that fall back on the defendant, maybe not.  I'll have to
3  hear what you tell me about that.  But I can't tell you go
4  ahead and do it and it will be on them to re-winterize it.  I
5  understand and it sounds like it was done again in perfectly
6  good faith, taking steps to try to protect your boat.
7           MR. MORELLI:  Your Honor, when they shrink
8  wrapped the boat, if you look at the pictures -- I'm sorry.
9  Should I be standing?
10           THE COURT:  You should probably actually let
11  Mr. Seitz do the talking, Mr. Morelli, if you want the real
12  answer.  And I'll give you a chance to confer with your
13  counsel, if you would like.
14           MR. MORELLI:  Thank you.  Sorry.
15           THE COURT:  In fact, why don't you do that.  Why
16  don't you confer with your client.  If there is something he
17  wants on the record, you go ahead and do that; okay?
18           (Pause.)
19           MR. HESS:  Your Honor, if I might on behalf of
20  plaintiffs?
21           THE COURT:  Okay.  I'll give you a chance, too,
22  but he needs to hear when you speak.
23           MR. SEITZ:  Your Honor, I think my client has a
24  practical solution.  He believes that he could cut a hatch
25  access-way into the back of the shrink wrap so he could get

in there to take a look at that, and then it could be taped back up again without having to actually shrink wrap the whole vessel again.

THE COURT: Okay.

MR. HESS: Your Honor, plaintiffs have no problem with that. When we communicated this to the defense at the time of the original inspection, which I believe was in December, if I'm not mistaken, we said it had been shrink wrapped. That they could have access but they would have to reseal it because substitute custodian is obliged to protect the vessel status quo. And so that's why we took the steps to winterize the shrink wrap.

THE COURT: Okay. Why don't you folks talk about how to handle this. It could be that you've got a practical solution and it would obviate the question about the condition of the outriggers. Clearly, representatives of both parties should be present when anything further is done with the boat. All right? And you should be able, both of you, to see what is going on with it and with respect to sealing it back up. In short, you guys know about boats.

MR. HESS: Right.

THE COURT: Here is the irony. I have to sit in judgment of your dispute but, you know, I don't know anything past a canoe and a dingy so I don't know what to do about your boat to make sure it's safe and I would like to make sure it

1  safe. And I'm sure, frankly, that the representatives of the
2  plaintiffs want to make sure it's safe because if it's not,
3  they expect you will be looking to them.  So everybody has got
4  a mutuality of interest here to see if the shrink wrap is to
5  be broken, it's done in a way that allows it to be resealed so
6  that everybody is comfortable that the boat ought to be all
7  right.  And you folks have got the expertise.  Talk to each
8  other and see what you can work out in that regard.
9           And let me say just a couple other things really
10 quickly.  First, I don't think I saw on the witness list but
11 I could have just blown past it, that the parties -- oh, there
12 it is.  I apologize.  Is there is a question about Ms. Barbara
13 Fahey who is a representative of the U.S. Marshal Services
14 listed as a witness?
15          MR. HESS:  That's correct.
16          THE COURT:  The Marshal Service clearly needs to
17 be consulted when you are talking about rescheduling because,
18 you know, they're so busy with so many different things.
19 And I certainly don't feel comfortable unless Ms. Fahey is
20 there when we try to coordinate so it works best for
21 everybody's schedule, and if I have to get involved I will,
22 but I think they'll be cooperative.  You just let them work
23 with you.
24          Second, if there is going to be an assertion that
25 -- and I don't know whether there is or not because I'm not

Lloyd - direct

1  they didn't make it, that is overruled. The relevance I
2  think is apparent so the document is accepted in evidence.
3  *  *  *    (Plaintiff's Exhibit No. 4 was received into
4  evidence.)
5              THE COURT: Go ahead with your questions, Mr.
6  Hess, and the witness will be subject to cross about the
7  document.
8              MR. HESS: Thank you, Your Honor.
9  BY MR. HESS:
10 Q.    When did you become manager?
11 A.    It was roughly around middle, June.
12 Q.    Of which year?
13 A.    This year -- well, last year, 2004.
14 Q.    Are there, in reviewing that bill, did you detect any
15 inaccuracies in it?
16 A.    Yes, August, the boat was not there. The first bill.
17 Q.    August of which year?
18 A.    2003.
19 Q.    So are you willing to --
20             THE COURT: Well, wait, wait, wait. You just
21 spoke over him. Finish your answer. What?
22             THE WITNESS: For $430.
23             THE COURT: So that should not have been on the
24 bill?
25             THE WITNESS: Yes.

Lloyd - direct

1           THE COURT:  All right.
2    BY MR. HESS:
3    Q.    With the exception of that, are there any inaccuracies
4    in that bill?
5    A.    No.
6    Q.    What is the total then that is owed Summit North
7    Marina by Mr. Morelli?
8    A.    On the bill.
9    Q.    For the Long Island Lady, I should say?
10   A.    On the bill, it's $4,945.  If you take that off, it's
11   $4,615.
12   Q.    Does the marina ordinarily allow vessels to leave the
13   marina with open invoices?
14   A.    No, they do not.
15   Q.    I want to ask you about the circumstances surrounding
16   the alleged incident that occurred in June of 2005 when Mr.
17   Morelli's engine supposedly failed on Long Island Lady.  Were
18   you at the marina on that day, the Sunday?
19   A.    Yes, I was.
20   Q.    Mr. Morelli testified that it was himself and another
21   gentleman that were the only passengers on Long Island Lady
22   that afternoon.
23   A.    That is not correct.  I did see his daughter and his
24   wife on the docks.
25   Q.    Okay.  Did Mr. Morelli give you an account as to what

Lloyd - cross

1  A.    What was the question?
2  BY MS. SISKIN:
3  Q.    Do you know why Ms. Trala was terminated?
4  A.    Yes. Actually, she had two customers in there that
5  were, she was giving gas to and not taking any money on.
6  There was a couple more than that. She was also terminated
7  for two of her friends, one was her boyfriend and one was her
8  best friend, having free slips.
9  Q.    Do you know she was terminated because she gave Mr.
10 Morelli any free services at Summit Marina?
11 A.    Not at all. I had no part to do with it because none
12 of this really came up until after she was fired. When Mr.
13 Machulski came in and talked to me and asked Mr. Morelli had
14 owed us any money, I looked on the books and I didn't see any
15 payment from Mr. Morelli.
16 Q.    What book did you look in?
17 A.    QuickBooks.
18 Q.    Is that a computer program?
19 A.    Sure is.
20 Q.    Can you print records from that computer program?
21 A.    Yes.
22 Q.    Did you produce those records in connection with
23 discovery in this case?
24 A.    There wasn't anything there. I couldn't print.
25 Q.    You said you looked at Mr. Morelli's account in the

Lloyd - cross

1  QuickBooks program?

2  A.   Yes.  What you do is a screen whose paid what money
3  for what, and if you go down the line and their name wasn't
4  there, you couldn't print it.  So that was showing me he
5  hadn't paid any money for the year.
6  Q.   Did you see his name there?
7  A.   No, I did not.
8  Q.   Did you see any indication that Mr. Morelli was a
9  customer?
10 A.   No.
11 Q.   When a boat comes in, who's primarily responsible for
12 taking the necessary information to get in touch with the
13 boat owner into Summit Marina?
14 A.   The office personnel or security guard, whoever is in
15 there, they usually fill out a transit form or something like
16 that, or the general manager.
17 Q.   They fill out what kind of form?
18 A.   A transient form.
19 Q.   What is on that form?
20 A.   Phone number, name of the boat, length of the boat,
21 things like that.
22 Q.   Did you have a card like that for Mr. Morelli's boat?
23 A.   No, I did not.
24 Q.   Were there any records whatsoever for Mr. Morelli's
25 boat?

Lloyd - cross

1   A.     Yes.

2   Q.     And all of June, wet storage; right?

3   A.     Yes.

4   Q.     Wasn't there time that it was out of the water?

5   A.     Yes.  It had been in the water for awhile though,

6   before the first time the engines blew.

7   Q.     Between June 13th, you said you took it out of the

8   water, shortly after June 13th.  You don't remember whether

9   it was that day or the next day?

10  A.     No.

11  Q.     But it was shortly after June 13th, right?

12  A.     Yes.

13  Q.     And then it was on land for awhile; right?

14  A.     I don't think it was awhile.  It was less than a week.

15  Q.     New engines were put in less than a week later, within

16  that week?

17  A.     A week, week and-a-half.  I can't be positive of that

18  but it was.

19  Q.     And then how long did the boats stay on land after the

20  engines were put in?

21  A.     I just told you I don't know.

22  Q.     And then you put it in the water?

23  A.     Yes, the boat was put in the water.

24  Q.     Did Mr. Morelli take the boat and leave Summit North

25  Marina after you put it back in the water?

B-222

Lloyd - cross

1   A.        Yes.
2              MS. SISKIN:  No more questions.
3              THE COURT:  Redirect?
4              MR. HESS:  Nothing further, Your Honor.
5              THE COURT:  All right.  Sir, you may step down.
6   Thank you.
7              Your next witness, Mr. Hess.
8              MR. HESS:  The plaintiff rests, Your Honor.
9              THE COURT:  Well, before you rest, I want you to
10  take a moment and make sure whatever it is you intended to
11  have moved in, is a actually in.  So take a minute and check
12  with the courtroom deputy and let's make sure because what I
13  don't want to you do is say after we were done is wait, I
14  meant for that to be in evidence.
15             MR. HESS:  All right.  Thank you, Your Honor.  I
16  appreciate the opportunity.
17             (Pause.)
18             MR. HESS:  At this point in time I want to put
19  Plaintiff's Exhibit 3E into evidence as well, Your Honor.  3E
20  is the return receipt from certified mail when the bill was
21  sent from Engine Dynamics to Mr. Morelli in June.
22             THE COURT:  Fine.  Your position?
23             MR. SEITZ:  No objection, Your Honor.
24             THE COURT:  Admitted without objection.
25  *   *   *   (Plaintiff's Exhibit No. 3E was received into

1   would send her a check if that is what she wanted.
2   Q.   And I'd like to show you what has been marked as
3   Defendant's Exhibits 22-G and H.
4           (Documents passed forward.)
5           THE WITNESS:  That's my outrigger.
6   BY MR. SEITZ:
7   Q.   Is this the condition that your outrigger was in at
8   the time that the -- when was the last time you were at
9   the boat prior to the boat being arrested?
10  A.   It was in Lewes in the beginning of October.
11  Q.   Were you, at the beginning of October, is this the
12  condition that your outriggers were in?
13  A.   No, when I left the boat it was fine.
14          THE COURT:  Left the boat what?  I can't hear
15  you, Mr. Morelli.
16          THE WITNESS:  I'm sorry, Your Honor.  I said when
17  I left the boat, it was fine.
18  BY MR. SEITZ:
19  Q.   So the outriggers were not on the boat at the time?
20  A.   No, the boat was out of the water and the outriggers
21  were not bent.
22  Q.   Do pictures 22-G and H depend a depict a bent
23  outrigger?
24  A.   Yes, it does.
25  Q.   What does it cost to replace the outrigger?

Morelli - cross

1   A.      Those outriggers?  A few thousand dollars.
2           THE COURT:  How much?
3           THE WITNESS:  A few thousand dollars.
4           MR. SEITZ:  I have no further questions, Your
5   Honor.
6           THE COURT:  Mr. Hess, cross-examination.
7           MR. HESS:  Yes, can I have just a moment to
8   confer with my client?
9           THE COURT:  Yes.
10          (Pause.)
11          THE COURT:  You are going to have to get going,
12  Mr. Hess.
13                      CROSS-EXAMINATION
14  BY MR. HESS:
15  Q.      Mr. Morelli, when you agreed to work with Mr.
16  Machulski, you made a special arrangement, did you not, that
17  allowed to you take the removed engines and rebuild them
18  yourself?
19  A.      Have them rebuilt.  Not rebuild them myself.  Have them
20  rebuilt.
21  Q.      Have them rebuilt.  Did Mr. Machulski tell you that he
22  never would install rebuilt engines himself?
23  A.      Did he ever say that to me?
24  Q.      That's my question, yes.
25  A.      Say the question again.